Jerold D. Friedman (SBN: 290434)
    jerry@lawofficejdf.com
LAW OFFICE OF JEROLD D. FRIEDMAN
19744 Beach Blvd. #390
Huntington Beach, CA 92648
Tel: (213) 536-1244
Fax: (281) 667-3506

Attorney for Plaintiffs

U.S. DISTRICT COURT
CENTRAL DISTRICT of CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| ABET SECURITY SERVICES, INC., | Case No. 2:22-cv-7713 |
| Plaintiff, | **Original Complaint for:** |
| | **1. WHISTLEBLOWER** |
| v. | **RETALIATION (FIRST** |
| | **AMENDMENT)** |
| CITY OF LOS ANGELES, DET. BENJAMIN JONES, OFC. ERIC ROSE, and DOES 1–10, inclusive, | **Demand for Jury Trial** |
| Defendant. | |

Plaintiff Abet Security Services, Inc., on behalf of itself and the general public, alleges as follows against Defendants City of Los Angeles, LAPD Detective Benjamin Jones, and LAPD Officer Eric Rose, as well as "Doe" Defendants, names unknown:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Federal questions arise pursuant to 42 U.S.C. § 1983 and the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this Complaint happened in the Central District of California.

3.      Plaintiff Abet presented a timely governmental tort claim with Defendant City on July 12, 2022. Defendant City constructively rejected the claim on August 26, 2022.

## II.  PARTIES

4.      Plaintiff **Abet Security Services, Inc.** ("Abet" or "Plaintiff") is a corporation with its headquarters and principal place of business in the State of California.

5.      Defendant **City of Los Angeles** ("City" or "Defendant") is a municipality and charter city organized under Article XI of the California Constitution. City acted under color of state law at all times relevant to the instant Complaint.

6.      Defendant **Detective Benjamin Jones** ("Det. Jones") is a law enforcement officer with the Los Angeles Police Department. Det. Jones acted under color of state law, in his individual capacity, and within the course and scope of his employment at all times relevant to the instant Complaint.

7.      Defendant **Officer Eric Rose** ("Ofc. Rose") is a law enforcement officer with the Los Angeles Police Department. Ofc. Rose acted under color of state law, in his individual capacity, and within the course and scope of his employment at all times relevant to the instant Complaint.

8.      The true names of the defendants named herein as **Does 1–10** (collectively, "Does" or "Doe Defendants"), whether individual or otherwise, are unknown to Plaintiff, who therefore sues Doe Defendants by fictitious names. Plaintiff is informed and believes that Doe Defendants are California residents. Plaintiff is informed and

believes that each of the Doe Defendants have participated in unlawful acts as alleged in this Complaint. Doe Defendants, who are City employees sued in their individual capacity, acted in the course and scope of their employment, and under color of state law, in each act committed or omitted as alleged below. Plaintiff will seek leave to amend this Complaint to show such true names when they have been determined.

9.      Whenever in this Complaint an act or omission of a government, corporation, or business entity is alleged, said allegation shall be deemed to mean and include an allegation that the government, corporation, or business entity acted or omitted to act through its authorized officers, directors, agents, servants and/or employees, acting within the course and scope of their duties, that the action or omission was authorized by managerial officers or directors, and that the act or omission was ratified by the government, corporation, or business entity.

10.      This Court has personal jurisdiction over each of the Defendants because each either resides in, is based in, is authorized or registered to conduct, or in fact does conduct substantial business in California.

## III.  INTRODUCTION

11.      This is a private attorney action brought by Plaintiff Abet on its own behalf and on behalf of the general public. Abet is a private security firm that has provided and presently provides private security guard services for the City of Los Angeles and particularly its Los Angeles Police Department ("LAPD") for approximately six years.

12.     City's employees, including its law enforcement and security officers, lawlessly have instructed private parties to cancel and not to make new contracts with private companies, costing Abet millions of dollars. This was done, and continues to be done, without even a modicum of due process. It reflects retaliation of protected speech by Abet, through its employees.

13.     In addition, although the City has continued with some parts of its contract with Abet, the City refuses to pay Abet in a timely manner. The City's unconstitutional abuse of Abet has cost it the ability to sell the company.

14.     The City, through its employees, unlawfully retaliated against Abet and its employees in violation of the United States Constitution as well as whistleblower and other protections under California law.

15.     City's employees have severely bullied and harassed Abet's employees. This misconduct includes repeated, unwarranted, and disproportionate hostility for Abet's employees who followed proper protocol contrary to City's employees' *ad hoc* wishes. Senior and lower-level LAPD employees have sexually harassed Abet employees causing the Abet employees to quit. One Abet employee was assigned to guard a parking garage and was properly parked, but a City official confronted and yelled at him for being improperly parked. Another Abet employee witnessed unlawful conduct by a City employee, reported it to proper channels, but was removed from her post simply because she reported the crime. Reported bullying and harassment is typically

ignored, seldom investigated, some investigations are shams, and policy and practice changes within the City to stop the misconduct has not resulted. The misconduct has injured Abet and its employees by having entire guarding assignments removed, specific Abet employees banned from guarding posts, reduced morale among Abet employees including some who have quit, and drastically reduced goodwill.

16.     City has solicited and required Abet to adhere to unlawful employment practices. For example, LAPD maintains a secretive list of individuals that it does not want Abet and other private security vendors to assign to City security posts. Individuals on this list were added by City without due process. This list violates City's own equal opportunity employment policy by blacklisting individuals who may have done nothing wrong or whose wrongdoing does not rise to the level of deserving banishment from City employment and employment-like contracts such as by being an employee of a City vendor. City also requires Abet to add the names of Abet employees to the list on the whim of mid-level and lower-level LAPD officials.

17.     Along the course of City's employees illegal and brash treatment of Abet and its employees, some City employees have developed a grudge against Abet. City employees have defamed Abet specifically intending to cause Abet financial and operational harm. For example, an LAPD official told a large group of Abet's vendors and customers that Abet was not permitted to perform security services for City and to avoid doing business with Abet because Abet lacked a permit. However, Abet was

properly permitted by the City to conduct business at all times for the span of Abet's six years of contract with the City. The defamatory remarks were malicious, retaliatory, and caused loss of revenue and goodwill.

18.     City has materially breached its contract with Abet. Breaches are overt, such as failing to pay invoices long after their due dates, and covert, such as by reducing Abet's staff while Abet is contractually required to keep adequate staff to service City's needs. The contract requires Abet to have adequate security guards available for all assignments and to have a supply in reserve who may be needed from time to time. In spite of this reasonable contractual requirement, City has bullied and harassed Abet employees causing some to quit or request assignment to non-City posts, has insisted some to be added to the blacklist without due process, has circumvented Abet by hiring some of its employees away from Abet, and has unreasonably delayed granting security officer permits to Abet that are necessary before Abet employees can be assigned to City posts. Each of City's material breaches has injured Abet.

19.     Abet files this lawsuit to recover its pecuniary losses and prevent future losses, to clear its name of wrongdoing for the arbitrary and capricious accusations of some City employees, and to protect the public, including security firms and individuals who are or may be added to the blacklist. Abet further seeks declaratory relief on the matter of the blacklist as against City's administrative policies, as well as state and federal law.

Original Complaint

## IV.  FACTUAL ALLEGATIONS

20.     Abet is a private security firm owned and operated by CEO Rosa Chavez ("CEO Chavez") and COO Raul Perez ("COO Perez").

**The City admits Abet has performed their Contract excellently.**

21.     Abet has had a continuous service contract with the City for approximately six years, that has been renewed each period after Abet submits a new security service proposal. The original contract, its renewals, and each of its amendments are collectively referred to herein as "Contract."

22.     Abet has an exemplary track record. City's internal evaluations of its several private security contracts with its several vendors has always resulted in high marks for Abet. For example, in the most recent evaluation period, Abet was given a 97% approval rating, which was the highest approval rating of all City's private security vendors for that period.

**Contract Administration and Disputes.**

23.     The LAPD Chief of Police is the person who signed the Contract on behalf of the City and, on information and belief, is the appropriate authority who ensures the City's contractual duties are fully performed and satisfied.

24.     The Contract is administered by LAPD's Security Services Department ("SECSD"). At the time this Complaint is filed, the City's contract administrator is LAPD Lieutenant Raymond Ingal. Lt. Ingal has administrative powers over all private

security vendors including Abet that, on information and belief, were delegated to the contract administrator by the chief of police.

25.    At all material times, Defendant Detective Jones was (a) the actual or *de facto* head of the Commission Investigation Division ("CID"), (b) the actual or *de facto* contract administrator over all City relations between and among OPGs and the City's contracted private security services, including Abet, and (c) Abet's liaison to CID. At all material times, Defendant Ofc. Rose was the OPG Association Executive Director.

26.    When the City alleges a breach of the Contract, the City is required to send notice to Abet of the allegation and allow Abet thirty (30) days to cure any violation (*see* Contract, at PSC-10). A separate clause requires the City and Abet to attempt "amicable settlement in cases of Dispute" (*see* Contract, Disputes, Sec. 7). Abet has dutifully attempted to resolve each of the issues it complains about in the instant Complaint but the City and its employees have not. Abet therefore alleges that City has waived these contractual provisions due to persistent nonperformance.

**The City baselessly instructed all OPG companies to cancel and not make new contracts with Abet, falsely claiming Abet was not licensed, costing Abet millions.**

27.    Under the Contract, a significant part of Abet's business comes from providing security services to Official Police Garages ("OPG"). An OPG is a private business that works with the City to hold impounded vehicles. Abet and analogous private security vendors are used to guard the City's network of around twenty OPGs.

28.     The OPG network formed an OPG Association. Members of the OPG Association and select other businesses, including Abet, communicate with each other through an electronic listserv.

29.     Under the Contract, the City assigns Abet to provide security at specific posts including posts at City locations and posts within the OPG network. Each of the City's post orders specifies the location, personnel needed, hours of arrival and departure, and other details. Abet also makes independent contracts directly with OPG members.

30.     At the start of 2019, Abet provided security services for at least fourteen (14) OPG customers, in addition to its separate City posts. These OPG contracts generated well over a million dollars of revenue on an annualized basis.

31.     On or about March 1, 2019, Det. Jones expressly, but baselessly, directed Ofc. Rose to give a lawless instruction that *all* OPG Association members *must* stop employing Abet. Ofc. Rose, following Det. Jones's direction, sent an e-mail to the entire OPG electronic listserv that was automatically forwarded to all OPG Association members. The e-mail said the following in material part:

> "If you are using Abet Security Services, you need to stop
> immediately. CID has just informed the [OPG] Association that
> they are **NOT** licensed to do business in the City of Los
> Angeles." (Emphasis in original.)

32.     Obviously, this would have been a very serious deficiency if Abet lacked the needed license to do business. The message carried immense force being signed and circulated by Ofc. Rose through the official network used by the City.

33.     However, Det. Jones's and Ofc. Rose's statement was patently false. Abet was at the time (and at all relevant times was and has continued to be) properly licensed to do business in the City of Los Angeles. Det. Jones and Ofc. Rose in fact knew that Abet was licensed to do business in the City of Los Angeles.

34.     The false e-mail notwithstanding, Abet was and continued to be under Contract with the City. Lt. Ingal and other relevant City officials never terminated its Contract with Abet because there was no basis for the City to terminate the Contract. No one, not the City, Det. Jones, Ofc. Rose, nor anyone else ever has even claimed a basis to make this false statement.

35.     Even if there had been some violation by Abet (which there was not), Det. Jones's and Ofc. Rose's false statement would not have been authorized by any term of the Contract. Det. Jones was obligated, pursuant to the Contract, to initiate the Breach or Dispute provisions for any perceived breaches or disputes, but this was not done. Had the City, Det. Jones, or Ofc. Rose done so, Abet would dispute the allegations and, for this allegation, Abet easily could have documented its compliance with all licensing and permitting requirements. The e-mail thus was sent without any modicum of due process. Unilateral broadcasting of false information to Abet's existing and potential

customers and vendors is not an acceptable remedy under the Contract (nor for anything under any circumstance).

36.     On the same day, Det. Jones directed Ofc. Rose to enforce L.A. Municipal Code § 52.34 against Abet, again with no lawful basis whatsoever. This section requires additional licensing, training, and equipment for private security companies that has not been required of Abet or analogous vendors. The City has expressly maintained that Abet and analogous vendors do *not* need to comport with the requirements of Sec. 52.34. Enforcement of this section would burden Abet (and analogous vendors) with expenses not contemplated when bidding for or accepting the Contract. Det. Jones and Ofc. Rose in fact knew this. Abet had always relied upon the City's statement and, if the City had changed its rules, Abet would have complied with this section. But the City had *not* changed its rules, had *not* instructed Det. Jones to enforce this rule, and Det. Jones had not directed Ofc. Rose (or anyone else) to enforce Sec. 52.34 against any analogous vendor. Later, in March 2019, Ofc. Rose admitted that the City had no record of any analogous vendor ever being required to comport to the requirements of Sec. 52.34, and he admitted that none of Abet's competitors met those requirements. Nonetheless Det. Jones directed Ofc. Rose to enforce the inapplicable section.

37.     The lawless actions by Det. Jones and Ofc. Rose cost Abet dearly. Many OPG Association members in fact (and reasonably) believed that disobedience to Ofc. Rose's instruction would cause them to suffer retaliation by CID, Det. Jones, and Ofc. Rose.

Such retaliation could come in many forms, ranging from improper citations from additional site inspections, falsely sustained complaints against OPGs (OPGs receive many complaints from the public as a routine part of doing business with the City; these complaints are judged by CID personnel), and even potentially loss of City business.

38.     Within 90 days of Det. Jones's and Ofc. Rose's e-mail, Abet lost more than 80% (11 of 14) of its OPG customers and, in addition, Abet lost its OPG posts under the Contract. These losses caused Abet to lose more than $1.15 million in business in 2019. Furthermore, the removal of the other OPG contracts deprived Abet of an estimated $1.9 million per year for three years. During this period, several of Abet's OPG customers told Abet that they would like to continue to work with Abet but they feared similar retaliation by Det. Jones or other City officials if they did.

39.     Det. Jones continued to repeat the patently false information about Abet within LAPD, including to L.A. Police Commission Executive Director Richard M. Tefank, who also perpetuated the false statement that Abet was not licensed to Abet's customers, and to its vendors. Like Det. Jones, Dir. Tefank knew, and easily could have verified, that Abet actually had all applicable licenses and permits, which was the same set of licenses and permits that was accepted for all other analogous vendors. Abet is still learning about the extent of damage caused by the false statements made by these multiple City officials, among others.

**LAPD ratified and covered up the lawless punishment of Abet.**

40.     Abet filed an LAPD Internal Affairs complaint against Det. Jones for his actions stated above. LAPD entirely exonerated Jones on or about June 24, 2020. An exoneration meant that, according to LAPD, there was zero merit to the complaint. LAPD exonerated Jones specifically to discredit allegations violations against Jones – with additional violations against others in LAPD – despite the evident and provable merit of the objective evidence stated above. The investigation was a sham.

**The City's lawless punishment of Abet constituted retaliation.**

41.     The broadcasting of patently false accusations against Abet has no justification. It does, however, reflect retaliation by LAPD officers, retaliation that the City refused to stop and instead ratified.

42.     Shortly before publication of the above-quoted instruction by Det. Jones and Ofc. Rose, on or about February 28, 2019, Abet was assigned to guard Viertel's (1155 W. Temple Street, Los Angeles, CA 90012), which is an OPG.

43.     On that date, the owner of a car impounded by City officials alleged that a laptop had been stolen. If there had been a laptop, it should have been on an inventory prepared *by LAPD officers* (not by Abet) *when the vehicle was being impounded*, as was normal procedure. However, there was no such laptop on any inventory. Hence, the existence of the laptop and theft could not even be definitively established. If there had been a laptop, the most likely explanation was that the laptop was stolen before the car

ever came under the supervision of Abet's staff. If anyone should have been held responsible it would have been the officials who failed to do the inventory and/or someone who removed the laptop before it was brought to Viertel's.

44.    With no basis whatsoever, Det. Jones and a second LAPD detective concocted an accusation that the posted Abet security officer on duty had stolen the laptop. In any event, the lack of an *uninventoried* laptop could not have been evidence against any wrongdoing by the Abet staff. Abet personnel generally do not have access to inventory records. If there was a laptop, it strains credulity that a laptop was stolen from a vehicle that happened not to be inventoried by a person who would not have known the laptop wasn't inventoried. It remains unclear to this day if a laptop was in fact stolen and, if it was stolen, who stole it. The accusation against Abet may well have been made to conceal the LAPD officer's failure to inventory the vehicle, or worse.

45.    The laptop theft was investigated, poorly, by an LAPD detective. A different person, who claimed (without providing support) to be working with the investigating LAPD detective, asked COO Perez for confidential information about the accused Abet guard. COO Perez followed California law -- and LAPD's own investigative procedures – and did not disclose said information. Rather than recognize that the lack of an inventoried laptop most likely meant that (a) there never was a laptop or (b) the laptop was removed before the car was brought under Abet's security, the LAPD detective blamed COO Perez for the theft because he refused to disclose the employee's

confidential information. Of course, *there was no evidence to support finding fault with any actions of any Abet staff.* No one at Abet ever has been found responsible for the missing laptop, neither civilly nor criminally.

46.     Within a short time after concocting the false charge against Abet and COO Perez, Det. Jones and Ofc. Rose sent the retaliatory e-mail. The damage was done.

**Even after losing the great majority of its OPG business, Abet continued to fulfill its ongoing City Contract with the City, with consistently excellent performance.**

47.     Even after City officials falsely asserted that Abet lacked necessary licenses and permits, Abet remained under Contract with the City, and the City allowed Abet to continue to provide security for three (out of 14 prior) private OPG contracts. Thus, the City recognized that, in fact, Abet had all needed licenses and permits at the time of Det. Jones's and Ofc. Rose's e-mail.

48.     Moreover, since 2019, Abet consistently received high marks for its work, *according to the City's own reviewers.* During this period, the City repeatedly continued to extend its Contract with Abet, which Dir. Tefank, Det. Jones, and Ofc. Rose knew. The City assigned new posts to Abet after the e-mail was broadcast despite neither the City nor Contract making changes to Abet's required licenses or permits.

49.     City steadfastly has refused to provide a correction that admitted its broadcast was false. Abet has not recovered the lost OPG business.

**The City repeatedly acted to frustrate Abet's ability under the Contract to perform services for work outside OPGs, including repeated sexual and other harassment.**

50.     In addition to denying business opportunities by making the patently false claim that Abet lacked needed licenses and permits, multiple SECSD employees harassed Abet staff with impunity. Those abusive employees initiated aggressive confrontations, turned what should have been (at most) simple disagreements into vendettas, and abused Abet staff with sexual pressure. Abet reported these abuses as legally, contractually, and morally required but the City deliberately deafened its ears and refused to even to conduct a meaningful investigation – much less discipline – of even the most egregious repeat offenders. Far from acting in good faith, the City effectively approved the harassment, which was not conducted against Abet's competitors.

51.     In this regard, the City's denial of due process, discriminatory treatment of Abet, as well as its refusal to rectify the lawless instruction for OPG members to cancel Abet – and even more threatened terminations of the Contract, reflects additional retaliation. Examples of these lawless acts include the following events, that have continued over, literally, years.

52.     On or about April 20, 2019, Abet security officer P1[1] was posted at the main gate of the City's Donald C. Tillman facility. At that post, SECSD Sgt. Drones requested a logbook from P1, whereafter P1 addressed Sgt. Drones as "Sir." Sgt. Drones then

---

[1] Abet's employees are identified by an initial and number to protect their privacy.

inexplicably responded with a tirade for P1 not addressing him as "Sergeant Drones." Sgt. Drones yelled at P1 so severely that P1 became incontinent and defecated in his pants. Since this occurrence, Sgt. Drones, SECSD Supervisor Sgt. James Onthank, and other SECSD personnel have nicknamed P1 "biohazard" and publicly refer to him by that name. Abet's report of this incident was ignored by City officials.

53.     On or about October 28, 2019, Abet security officer A1 reported to her supervisor that SECSD Ofc. Andrei Santos created an ongoing, hostile work environment for herself and other Abet employees at the Tillman facility. A1 reported, for example, that Ofc. Santos harassed her by falsely reporting that an SECSD supervisor was coming to investigate her and insinuated that she would be terminated. This false report caused A1 stress, fear, and anxiety. Thereafter, A1 continued to suffer anxiety in the presence of Ofc. Santos.

54.     On the next day, Abet had a meeting with Sgt. Onthank to resolve this issue. There, A1 described to Sgt. Onthank the incident above and other harassing actions by Ofc. Santos, including sexual harassment. A1 had an emotional breakdown while describing Ofc. Santos's behavior to Sgt. Onthank. For a time thereafter, Ofc. Santos was reassigned to another LAPD facility due to the incidents but, so far as Abet is aware, he was not disciplined. Moreover, as of May 2022, Ofc. Santos had once again been assigned to the Tillman facility and worked near A1, despite Abet's protests, until A1's June 2022 resignation due to incidents and stress related to Ofc. Santos.

55.    LAPD Lt. McComas repeatedly sexually harassed Abet security officer V1. Initially, Lt. McComas had pressured V1 to leave her City Hall post to walk with him around the City Hall hallways. V1 understood Lt. McComas's behavior to mean that she was being paraded in front of other City employees as Lt. McComas's love interest, despite her having no romantic interest in him whatsoever (as well as the impropriety of this senior officer exploiting Abet's young employee). V1 was afraid that if she did not leave her post and walk with Lt. McComas, he would fabricate a story about her that would cause her to suffer employment or other consequences with Abet or the City. V1 was additionally concerned that, due to McComas's rank as lieutenant, she had no power to refuse his demands without suffering further punishment.

56.    The abuse culminated in or about July 2020, when Lt. McComas subjected V1 to explicit sexual details about what he did while inside a Los Angeles strip club. Lt. McComas's description of his actions, offensive language that he used while describing it to V1, and innuendo regarding what he wanted to do sexually to V1 caused her to report the misconduct request a transfer to be away from McComas.

57.    On or about October 15, 2020, with no lawful basis, Sgt. Drones attempted to remove Abet security officer S1 from his City post by grabbing S1 and shoving him. After several failed attempts by Sgt. Drones to grab and physically remove S1, Sgt. Drones called the Watch Commander seeking to have S1 removed from the post. Fortunately, the removal was denied because there was no lawful nor contractual basis

to have him removed. So far as Abet is aware, Sgt. Jones suffered no discipline or retraining for this assault.

58.     On or about July 14, 2021, at Hyperion Water Reclamation Plant, Sgt. Drones harassed Abet security officer J1. J1 was parked correctly at his post. SECSD Ofc. McGowan asked J1 to move his vehicle while she was attempting to exit the parking area. There was ample space for McGowan to exit safely, J1 was correctly parked at his post, and J1 informed McGowan of these facts. Sgt. Drones heard conversation between McGowan and J1, approached them, then raised his hand in a closed fist and threateningly moved it close to J1's face, causing J1 to think that he would be struck by Sgt. Drones. Sgt. Drones then informed J1 that he would have him terminated from this post. Sgt. Drones subsequently contacted COO Perez to inform him that Abet could no longer assign J1 to this post nor to any city post.

59.     On or about September 15, 2021, Abet supervisor D1 discovered a new camera in the lobby of the Emergency Operations Division ("EOD") site. D1 investigated and learned from another SECSD officer that the camera was placed there by LAPD Ofc. Santizo to harass Abet employees.

60.     On or about the same day, at EOD, Abet security officer V1 saw what she believed was a dead human body on a CCTV monitor. V1 asked Ofc. Santizo to intervene. Ofc. Santizo refused, asserting this issue was out of his jurisdiction and "not my problem." V1 then reported the body to her Abet supervisor, which eventually led to

an investigation by LAPD Sgt. Ngo. Sgt. Ngo reprimanded Ofc. Santizo for not reporting a possible dead body to LAPD. Thereafter, Ofc. Santizo targeted and harassed V1 by falsely and punitively alleging substandard behavior to her supervisors and other officials including but not limited to falsely reporting to City contract administrators that V1 was late to her post.

61.     Human excrement and other unsanitary material were routinely found on the exterior grounds of the City's William Grant Still Arts Center ("WGSAC"). Also routinely, posted Abet security officers or WGSAC staff would notify the City's Sanitation Department for clean-up by calling the City's 3-1-1 call center. However, the City unilaterally stopped deploying its Sanitation Department to this Abet post on or about November 8, 2021. On this date, COO Perez discovered human feces at the WGSAC and reported it, but the City refused to have the material removed or building exterior cleaned, exposing Abet staff and members of the public to dangerous conditions. COO Perez was forced to remove Abet staff from this post until the City resumed sanitation of evident dangers to Abet staff.

62.     In January 2022, the City's then-contract-administrator Alyssa Quiros told Abet officials that LAPD Lt. Ingal had ordered Abet's Contract to be terminated. No basis existed for such termination, the Contract's procedures for breaches and disputes had not been initiated, and ultimately there was no termination, but Lt. Ingal's overreaching and threatening behavior was in no way retracted, and in no way corrected.

63.   In March 2022, Sgt. Onthank had called COO Perez, laughed about an incident where an Abet employee had been injured, stated, "You guys are fucked now!," then implied that Abet would lose the Contract with the City. As before, no basis existed for such termination, the Contract's procedures for breaches and disputes had not been initiated, and there was no termination. COO Perez notified LAPD Captain Warner Castillo, who is the Commanding Officer of the SECSD, of these facts but, to COO Perez's knowledge, no investigation nor discipline has corrected these groundless and harassing comments. Thereafter, Abet officials received numerous contacts from its employees who were demoralized and worried about losing their employment if the Contract were canceled. Apparently, Sgt. Onthank told other City and/or Abet staff that Abet was going to lose the Contract to bully, harass, and demoralize Abet staff.

64.   On or about April 4, 2022, Sgt. Drones gathered Abet security officers into a station conference room and baselessly berated them for being late to their posts. Abet employees had contractual orders to arrive "by 7:00 a.m." – which was the start of their shift. Further, the Contract specifically tolerates arrival up to seven minutes late (*see* Contract, Statement of Work Sec. 1.2) indicating a tolerance for arrival by 7:07 a.m., not 6:30 a.m. However, Sgt. Drones targeted and harassed Abet employees by falsely claiming that they were due at 6:30 a.m. Sgt. Drones did not complain about other security guards from other security firms who arrived at the same 7:00 a.m. start time.

Sgt. Drones had no contractual or lawful basis to demand that Abet employees arrive a half-hour before the start of their shift.

65.     On or about May 6, 2022, at the Tilman facility, LAPD Ofc. Santos harassed and baselessly berated Abet supervisor C1 for not following post orders despite C1 correctly following post orders. Ofc. Santos also falsely accused C1 of incompetence by leaving administrative building doors unlocked, when C1 had not left said doors unlocked. Ofc. Santos yelled and berated C1 so severely that C1 became fearful that Ofc. Santos would physically strike him.

66.     On or about September 12, 2022, Abet security officers M1 and O1 were posted at the Tillman facility's main gate. City employee Erica Barrios entered the parking lot through the exit lane, drove fast past the gate, almost struck M1 with her car who was standing in the road to interact with drivers in the entrance lane who were waiting to have their IDs checked by M1, and almost struck O1 who sat in a parked vehicle.

67.     Ofc. Barrios had driven in a dangerous and unsafe manner at this location before, which Abet reasonably believes is because Ofc. Barrios is routinely late to work and refuses to wait in line, in the correct lane, behind other cars. M1 and O1 had instructed her to drive safely before and Abet had reported these incidents to Sgt. Onthank before, but as of the filing of the instant Complaint, Abet is unaware of any meaningful investigation or discipline that has resulted from Abet's reports of Ofc. Barrios's dangerous behavior.

68.     Had Ofc. Barrios been disciplined, she would either stop repeated dangerous behavior or she would be terminated. Indeed, Sgt. Onthank had interviewed Ofc. Barrios on or before September 13, 2022, following one of her previous incidents of driving dangerously and risking injury to Abet staff. At that time, Sgt. Onthank responded to Abet supervisors that no dangerous activity had occurred, then Onthank refused to receive Abet's photographic evidence proving Ofc. Barrios's dangerous driving. The investigation was a sham.

69.     On or about October 10, 2022, Abet sent an e-mail to Capt. Castillo, that due to the hostile and uncorrected actions of several SECSD officers against Abet staff at the Tillman facility, Abet could not send its security guards to that location for fear of their safety. Abet cited "countless episodes" of intimidation, physical and verbal assaults, and an overall hostile work environment, Abet's past efforts to work with Lt. Ingal and SECSD to resolve the ongoing hostile work environment, but the City officials offered no reply to any of Abet's reported incidents, no acknowledgment of any issues, and no solution to protect the safety of Abet staff. Abet further cited extreme stress and discontentment of Abet staff and management for the incidents and SECSD's failure to take corrective action. Approximately two weeks later, the City removed Abet from the Tillman facility post.

70.     The several City employees mentioned herein among others have created an atmosphere of fear and anxiety, demoralizing many Abet employees and causing

several to quit employment with Abet. Under the Contract, Abet must maintain sufficient staffing to service the City's posts and to keep sufficient personnel available in reserve (*see* Contract, Personnel Levels, Sec. 3.6). City's abuse undermines Abet's ability to fulfill its Contract to service City's needs, driving up Abet's costs and decreasing its net revenues.

71.     Further, CEO Sanchez and COO Perez reasonably believe that their employees who were forced by the abuse to quit will tell prospective employees in the security guard industry about City's harassment that, in turn, will make it more difficult for Abet to hire new security officers, and potentially to obtain new contracts.

72.     City officials have full knowledge that City employees interfere with the Contract. Sometimes, the City officials involved in the administration and execution of the Contract are the employees who bully and harass. These multiple additional abuses by City officers and other employees also divert and subvert Abet's leadership from other work, including work to generate new business, causing significant damages.

**For nearly three years, City has withheld and delayed payments long past due.**

73.     On or about June 2020 and after, City slow-walks the permitting process for Abet security officers, a requirement for them before being assigned to City posts. On information and believe, analogous vendors have not had their security officers' permits slow-walked. Historically, the permitting process has been swift, taking several days to a few weeks for each person, and that remains true for individuals hired by analogous

vendors who compete with Abet for business. After the events described above, however, City officials basely have dragged out the permitting process – to months and years – just for Abet. This not only frustrates Abet's plans to expand, but it also frustrates Abet's ability to perform under the Contract.

**The City's retaliation has continued, punishing Abet after Abet's employee called out an LAPD officer for misuse of excessive force.**

74.    On or about April 2, 2022, Abet employee and security officer T1 was posted at Metro Communications LAPD 9-1-1 Dispatch Center. Her specified duties were to "observe and report" crimes and other incidents.

75.    While on post, T1 observed an Attacker attack a Victim. T1 then observed a City Security Officer ("LACSO") intervene and misuse excessive force on the Attacker, namely the use of an illegal chokehold.

76.    T1 reported the attack and the use of excessive force to the responding LAPD Officers, as well as to Abet pursuant to protocol. Responding City investigators, including from the Criminal Investigation Division and Internal Affairs, questioned T1 and Victim. Victim's account corroborated T1's report.

77.    Notwithstanding what had happened, T1 was pressured by the City investigators to change her report from having observed excessive force to not seeing excessive force. Despite the investigators' coercion, T1 did not change her story. Subsequently,

T1 was called a liar by City personnel to discredit T1's report that the City employee used illegal and excessive force.

78.    In response, with no lawful nor contractual basis, Lt. Ingal ordered Abet to remove T1 from working on the entire Contract. Abet refused to remove T1 for doing her job. Lt. Ingal then threatened to remove Abet from other posts if Abet did not follow his baseless orders. Facing economic calamity, Abet removed T1 from the post. She remains on Abet's payroll as of the filing of the instant Complaint but Abet is unable to place her on any City post.

79.    Later, on or about April 26, 2022, Lt. Ingal ordered the removal of Abet entirely from the Dispatch Center post. His asserted basis was that T1 had not physically assisted the LACSO in the arrest of Attacker, and for her reporting of the use of excessive force (despite her report being true and corroborated). T1 acted appropriately under State of California requirements — T1 was not allowed as a matter of law to get physically involved as she was there to observe and report.

80.    Nonetheless, as of May 8, 2022, Lt. Ingal had removed Abet from its post at the Dispatch Center in retaliation for the incident herein. Removal from this post deprives Abet of an estimated $252,000 plus due renewals.

**City's Misconduct has reduced Abet's Goodwill to Zero and has Prevented Its Sale**

81.    On information and belief, Abet's fair market value would be five million dollars or more had City and its employees fully honored the Contract without the several

instances of bullying, harassment, and other misconduct of Abet alleged herein and other instances not alleged herein.

82.     In late 2021, Abet and a private security company located in the State of Arizona discussed the sale of Abet to the Arizona company. The Arizona company intended to purchase Abet by mid-2022. Over the course of negotiations, Abet disclosed that a large part of its revenue comes from the City and also City's misconduct, including several instances of bullying and harassment alleged herein.

83.     Shortly after Abet disclosed to the Arizona company these facts, the Arizona company stated that its board of directors was no longer interested in buying Abet due to the very large risk exposure caused by City's misconduct. Abet reasonably believes this to mean that the Arizona company stopped negotiations due to its belief that after a prospective purchase the City might cancel the Contract or refuse to renew the Contract despite Abet's merit. In either instance, Abet under new ownership would not be able to maintain its staff, management, or facilities. In other words, Abet was viewed by the Arizona company as being unpurchaseable due to zero goodwill and zero market value.

## V.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### WHISTLEBLOWER RETALIATION IN VIOLATION OF
### THE FIRST AMENDMENT - 42 U.S.C. § 1983
### (AGAINST CITY OF LOS ANGELES, DET. JONES, AND OFC. ROSE)

84.     Plaintiff incorporates by this reference all preceding paragraphs as though they were stated here in their entirety.

85.    At all material times, Defendants qualify as persons who act under color of state law pursuant to 42 U.S.C. § 1983.

86.    Abet has a constitutional right to complain about any matter of public concern including the misconduct alleged herein against the City, its officials, employees, and other agents. Additionally, Abet has a constitutional right to complain about or expressly challenge government policies, actions, and misconduct. These rights are protected by the First Amendment of the U.S. Constitution made applicable to the states through the Fourteenth Amendment.

87.    Abet, through its owners and employees, made several complaints to City officials, including Lt. Ingal, Det. Jones, and several other contract administrators, regarding misconduct by City officials and employees against Abet owners, employees, and the public at large. Whistleblower complaints specifically must be made through the City, in this case contract administrators, and Abet has done so. However, whistleblower and other complaints made as required were wholly ignored or impliedly ignored having received only sham investigations and no correction or discipline.

88.    In response to the several complaints of City employee misconduct, including those that include matters of concern only to Abet and matters of public concern and safety, City and its employees have engaged in a pattern and practice of bullying and harassment against Abet and its employees. City employees have bullied, harassed, discredited and defamed, battered and assaulted, Abet and its employees to such

extremes that no person should be expected to withstand. In some instances, City employees engaged in primary misconduct, such as coercing T1 to change her eyewitness account of a City employee using an illegal chokehold, followed by secondary misconduct of banning T1 from any post in the Contract, followed by tertiary misconduct by removing the 9-1-1 Dispatch Center from Abet altogether because T1 would not retract what she saw and therefore lie about the illegal chokehold.

89.    Abet directly suffered from City and its officials punishing Abet and its employees such as by losing entire assignments or having its well-qualified staff removed from posts. City had no contractual justification for removing Abet from these assignments or posts. The Contract provides for certain procedures when the City alleges breach or has other disputes, which have never been invoked by the City. City never had cause, intention, nor motivation to remove Abet and its employees from these positions but for Abet's and its employees' whistleblower and other complaints.

90.    Abet has directly and proximately suffered pecuniary loss in excess of five million dollars plus due renewals as a result of City retaliation.

91.    In committing the acts and omissions alleged above, individual Defendants Det. Jones and Ofc. Rose acted in a despicable manner; with malice, fraud or oppression; with extreme indifference to the rights of Plaintiff at a level which decent persons should not have to tolerate; and with intent to cause harm to Plaintiff. Individual Defendants are therefore liable for punitive damages.

## VI.  REQUEST FOR RELIEF

92.  Plaintiffs request judgment against Defendants as follows:

a.  For actual, general, and special damages in an amount to be proved at trial.

b.  For contractual damages not less than $2,000,000.

c.  For loss of goodwill in an amount to be proved at trial.

d.  For punitive damages in an amount to be proved at trial against all individual Defendants (and not against Defendant City).

e.  For reasonable attorneys' fees and costs as provided by 42 U.S.C. § 1988 and California Code of Civil Procedure § 1021.5.

f.  For pre- and post-judgment interest.

g.  For such other and further relief as the Court deems just and proper.

## VII.  JURY DEMAND

93.  Plaintiffs demand a jury trial.

Dated: October 21, 2022                    By: Jerold D. Friedman

                                           */s/ Jerold D. Friedman*
                                           Jerold D. Friedman
                                           Attorney for Plaintiffs